FILED
2017 Feb-13 PM 02:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| ARLO TOWNSEND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  4:14-cv-01879-KOB-SGC |
| | ) | |
| CORRECTIONAL  OFFICER  JOEY | ) | |
| FISHBACK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The plaintiff, proceeding *pro se*, has filed amended complaints seeking monetary damages and injunctive relief pursuant to 42 U.S.C. § 1983 for violations of his civil rights.  (Docs. 4, 10, 11).[1]  The plaintiff names the following defendants in the amended complaints: Lieutenant Ronald Carter, Sgt. Hamilton, and officers Joey Fishback, Brandon Burns, Bryan Burke, McQueen, Lukima, Storey,[2] Mathis, and Humphrey.  (Doc. 4 at 4).  The plaintiff seeks injunctive and monetary relief. (Doc. 10 at 5; Doc. 11 at 4).  In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), this matter was  referred to the undersigned magistrate

---

[1] The court notes the plaintiff made various factual allegations to support his request for a temporary restraining order in a pleading filed on January 7, 2015, styled as a "Continuation on Order to Show Cause."  (Doc. 17).  However, the plaintiff did not sign this document as required by 28 U.S.C. § 1746.  As such, the facts contained in the document do not constitute evidence for summary judgment purposes.

[2] The plaintiff spells this defendant's surname as "Story" (Doc. 11 at 3), but the correct spelling is "Storey" (Doc. 31-10).

judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

## I. Procedural History

On April 14, 2015, the undersigned entered an Order for Special Report directing the Clerk to forward copies of the amended complaints to each of the named defendants and ordering the defendants to file a special report addressing the plaintiff's factual allegations. (Doc. 20). The undersigned advised the defendants that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would consider it as a motion for summary judgment filed under Rule 56 of the *Federal Rules of Civil Procedure*. (*Id.*).

On July 6, 2015, all defendants except Mathis and Fishback filed a special report, supplemented by affidavits and other evidence. (Doc. 31).[3] On February 29, 2016, the plaintiff's claims against Mathis were dismissed for lack of prosecution. (Doc. 44). On March 2, 2016, Fishback[4] filed a special report, supplemented by affidavits and/or other evidence. (Doc. 46). On March 8, 2016, the undersigned notified the parties that the court would construe the special

---

[3] On July 16, 2015, these defendants supplemented the special report with Humphrey's affidavit. (Doc. 32).

[4] When the Order for Special Report was entered, Fishback was on active military leave. (Doc. 33). The undersigned stayed the case until December 9, 2015, and extended service of process as to Fishback until January 9, 2016. (Doc. 33).

reports as motions for summary judgment and notified the plaintiff that he had twenty (20) days to respond to the motions by filing affidavits or other material. (Doc. 47).  The undersigned also advised the plaintiff of the consequences of any default or failure to comply with Rule 56.  (*Id.*).  *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  On May 5, 2016, the undersigned granted the plaintiff's motion for an extension of time to file a response and directed him to file a response by May 24, 2016.  (Doc. 54).  That deadline has expired, and the court has received no response from the plaintiff.  This matter is now before the court on the defendants' motions for summary judgment.

## II. Standard of Review

Because the court has construed the defendants' special reports as motions for summary judgment, Rule 56 governs their resolution.  Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000).  The moving party bears the burden of proof to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law.  *See Clark v. Coats &*

3

*Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532 (citations omitted).

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment.  *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)).  Additionally, because the plaintiff is *pro se*, the court must construe the complaint more liberally than it would pleadings drafted by lawyers.  *Hughes v. Rowe*, 449 U.S. 5, 9 (1980).  "*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will,

therefore, be liberally construed." *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006).

### III. Summary Judgment Facts

The bulk of the plaintiff's claims arise from three separate incidents of alleged excessive force. While the facts supporting the plaintiff's claims will be addressed chronologically in this section, for purposes of clarity the three incidents will be referred to as the Fishback Incident, the Burns Incident, and the Carter Incident.

### A.    The Fishback Incident

On July 9, 2014, defendant Fishback pepper "sprayed" the plaintiff "in front of a whole bunch of witnesses," and fabricated a false disciplinary infraction to justify the use of excessive force. (Doc. 4 at 1). The plaintiff alleges Fishback is a "dirty dope dealing" officer with substantial power in the prison. (*Id.*) (emphasis omitted). Accordingly, the plaintiff contends the prisoner "witnesses were afraid for their life to testify [at his disciplinary hearing], but they wrote affidavits on what they saw." (*Id.*). The plaintiff has not identified these inmates or produced their affidavits.

In an affidavit attached to his special report, Defendant Fishback avers Townsend's allegations—that he dealt drugs and wrote fraudulent disciplinary reports—are untrue. (Doc. 46-1). Fishback further avers:

5

> On July 9, 2014, Inmate Arlo Townsend approached G-Dorm where I was assigned as the rover. Inmate Townsend demanded to see another inmate assigned to G-Dorm. I ordered inmate Townsend to leave the area. Inmate Townsend attempted to push past me. Inmate Townsend closed his fist and stepped toward me. I sprayed inmate Townsend with Saber Red Spray. Inmate Townsend was placed in restraints and taken to the infirmary for medical treatment.

(*Id.*). Medical records confirm the plaintiff was decontaminated in the infirmary once he stopped "shouting and cursing." (Doc. 31-13 at 2-5). An abrasion to the back of the plaintiff's "right bicep" and another to his "upper back left side" were noted, along with his history of gastroesophageal reflux disease (GERD) and hemorrhoids. (*Id.*).

Officer Fishback charged the plaintiff with "Assault on a Person(s) associated with ADOC" as a result of the July 9, 2014 incident. (Doc. 31-2 at 2). The plaintiff was served with a copy of the charge on July 14, 2014. (*Id.*). (Doc. 46-2 at 2). After conducting an investigation of Fishback's use of pepper spray, Capt. Gary Malone signed an investigative report on July 16, 2014, determining Fishback's "use of force was justified" and recommended "no further action" regarding the matter. (*Id.*).

At the July 29, 2014, disciplinary hearing Fishback testified:

> I was assigned to G-Dorm. Inmate Townsend approached the gate and wanted to speak with an inmate he said had washed his clothes. I told inmate Townsend he could not speak with the inmate and ordered inmate Townsend to leave and return to his living area. Inmate Townsend refused and continued to try and get the attention of the inmate he was looking for. I again ordered inmate Townsend to leave.

6

> He did not comply.  Inmate Townsend then said "F—K YOU" and pushed me aside entering the porch area.  I then sprayed inmate Townsend with Sabre Red.

(Doc. 31-2 at 5).

While questioning Fishback at the hearing, the plaintiff denied threatening, cursing, advancing toward, or pushing Fishback and declared Fishback wrote the disciplinary report to "cover up" for his own mistake.  (*Id.* at 7-10, 15-16).  The plaintiff also testified on his own behalf, stating:

> About 5am I left the kitchen and went to G-dorm to pick up my clothes that an inmate had washed for me.  I couldn't get the attention of the inmate so I tried to get other inmates to get the inmate for me.  Officer Fishback did tell me to leave and go back to my dorm.  I did not leave because I needed my clothes and I know officer play [sic] with me like that.  He told me again to leave and I did not leave.  The officer kicked the gate open and ordered me to step inside the gate.  I did what he said because I did not want to get a disciplinary.  I stepped inside the gate and he sprayed me for no reason.

(*Id.* at 6).  The plaintiff submitted a written statement as well, which is essentially the same as his oral testimony, except the statement did not mention his repeated refusal to obey Fishback's direct order to leave the area.  (*Id.* at 7).

Ronald Carter, the disciplinary hearing officer, credited Fishback's testimony and found the plaintiff guilty of the infraction.  (*Id.* at 6).  On August 6, 2014, Warden Evans approved Carter's recommended punishment of 45 days disciplinary segregation; 60 days loss of canteen phone, and visiting privileges; and a custody review.  (*Id.* at 12-13).  On August 7, 2014, the plaintiff was served with a copy of

the disciplinary report.  (*Id.* at 14).

Fishback's actions resulted in the plaintiff's placement "in lock up for two months."  (Doc. 4 at 1).   The plaintiff "told the Administration about the situation with Fishback," and after an investigation, the Warden released the plaintiff from lockup.  (*Id.*).  The plaintiff provides no details regarding the investigation.  After his release from segregation, the plaintiff was placed back in the dorm where Fishback worked.  (*Id.*).  Fishback harassed the plaintiff by giving his mail to other inmates and told the plaintiff he would "get [the plaintiff] for telling administration what he did."  (*Id.*).  Fishback sought revenge on the plaintiff by teasing Officer Burns—described as one of Fishback's "malicious shift workers who like[s] to beat up inmates"—and goading him into beating the plaintiff.  (*Id*.).  Fishback denies harassing the plaintiff and attests he has "no knowledge" that he is "the reason for any situations between inmate Townsend and any other officer."  (Doc. 46-1 at 1).

The plaintiff declares defendants Fishback, Burns, and the other officers on that shift are empowered by their supervisor, Lieutenant Carter, who maintains "a shift of vigilante correctional officers who beat[] up inmates if they blink wrong and it has gotten bad lately.  They beat you up and put a false charge on you to cover it up and get away with assaulting inmates."  (Doc. 4 at 1.).  Defendant Carter admits he supervises the B-Nights Shift of 2 sergeants and 32 officers but denies the plaintiff's allegation that he supervises a shift of vigilante officers who

maliciously beat inmates. (Doc. 31-6 at 1).

**B.     The Burns Incident**

The plaintiff alleges that, around midnight on September 28, 2014, he and Officer Burns were discussing what had occurred earlier in the day during a disciplinary proceeding. (Doc. 10 at 4). Burns had charged the plaintiff with possession of a cell phone. (Doc. 31-5 at 1). The plaintiff does not dispute Burns's testimony that: (1) the discussion consisted of the plaintiff loudly cursing at Burns; and (2) the plaintiff told Burns, "Man, I got 20 years for this s—t! You ain't s—t! I'll f—k you up!" (*Id.*). When Burns told the plaintiff "to be quiet and continue walking to his assigned living area," the plaintiff responded, "'Man, f—k you, You ain't s—t. I'm going back to the shift office!'" (*Id.*).

The plaintiff does not dispute that he "turned around and started walking in the direction of the shift office," that he did not comply with Burns's order to stop, and that he "continued shouting profanities." (*Id.*). Neither does the plaintiff deny that he "aggressively turned toward [Burns] with clinched fists" when Burns tried to take him by the arm. (*Id.*). Burns "aggressively told" the plaintiff "it is over" while reaching for his mace. (Doc. 10 at 4). The plaintiff "started to run," but when Burns told him to "'get down,' [he] immediately dropped to the ground" on his stomach with his hands on his head. (*Id.*). Burns "jumped" on the plaintiff with one knee on his back, handcuffed the plaintiff's wrists behind his back,

9

punched the plaintiff's face "from both sides with both hands," and maced both sides of the plaintiff 's face. (*Id.*). The plaintiff "lay there while the other officers" arrived and continued to beat him. (*Id.*).

The court has examined the plaintiff's pleadings to determine the identity of these officers. In his first amended complaint, the plaintiff lists Lt. Carter, Sgt. Hamilton, and Officers Fishback, Burns, Burke, McQueen, Lukima, and Storey as defendants and alleges the "whole shift beat" him. (Doc. 4 at 1). In his second amended complaint, the plaintiff lists only Carter and Burns as defendants, refers to "the other officers" who arrived and beat him while he lay on the ground, and declares Carter led him and the officers to the infirmary after he had been beaten. (Doc. 10 at 4). In his third amended complaint, the plaintiff lists only Carter, Burns, Storey, and Humphrey as defendants and restricts his allegations to defendant Burns's personal assault and being kicked and beaten by "other officers" who arrived on the scene. (Doc. 11 at 3). The plaintiff has made no effort to clarify the discrepancies in these complaints. He attests inmates Manning, Daughtery, and Roberts witnessed the incident but has not produced affidavits from these inmates. (*Id.*).

According to Burns, when the plaintiff turned toward him with clinched fists:

> I then drew my Saber Red chemical spray and attempted to spray inmate Townsend. Inmate Townsend appeared to be unaffected by

the spray. A struggle took place and I took hold of Townsend and placed Townsend on the ground. While I was attempting to place restraints on inmate Townsend, inmate Townsend continued to struggle and fight. Officers responded. I then secured inmate Townsend in the restraints. Inmate Townsend was assisted to his feet and escorted to the infirmary.

As a result of the incident I was treated for an existing cut that was re-injured. At no time did I strike or attempt to injure inmate Townsend.

(Doc. 31-5 at 1).

Defendants Carter, Lukima and Hamilton responded to Burns's call for assistance. (Doc. 31-6 at 1; Doc. 31-7 at 1; Doc. 31-8 at 1). Defendant Lukima admits he "assisted in handcuffing" the plaintiff. (Doc. 31-7 at 1). Defendant Carter saw the plaintiff on the ground and heard him "shouting profanities and threats to Officer Brandon Burns and other officers responding to the call for assistance." (Doc. 31-6 at 1). Burns told Carter the plaintiff had assaulted him and that he had maced the plaintiff. (*Id.*). Carter avers the plaintiff "was placed in handcuffs and assisted to his feet." (*Id.*). Sgt. Hamilton avers the plaintiff was already in handcuffs and was being escorted to the infirmary by the time he responded to Burns's call for assistance. (Doc. 31-8 at 1).

Officer Burke denies the plaintiff's allegations because he is "assigned to day shift," does "not work after 6 pm," and was not at work on the date of the incident. (Doc. 31-9 at 1). Officers Storey and McQueen attest they have "no personal knowledge of the incident," and Fishback denies having knowledge of the plaintiff

11

being beaten by the entire shift.  (Doc. 31-10 at 1; Doc. 31-11 at 1; Doc. 46-1 at 1).

Officer Humphrey avers he "was assigned to [the] segregation" unit on September

28, 2014.  (Doc. 32-1 at 1).  Although there was "a call over the radio for

assistance," Humphrey states he "would not have responded" because of this

assignment.  (*Id.*).

## C.     The Carter Incident

The plaintiff declares that he was sobbing, in pain, and unable to see after

the Burns incident.  (Doc. 10 at 4).  Lt. Carter led approximately ten (10) officers

"up the sidewalk to the infirmary."  (*Id.*).  Again, it is difficult to determine which

defendants the plaintiff alleges participated in the events.  In the first amended

complaint, the plaintiff appears to name all of the defendants except Fishback and

describes the event as follows:

> *They* walked me up to the infirmary and stopped in a secluded corner
> and the Lt. told them to "stop" right here and *they* beat me up real bad
> again, knocked my teeth out of my mouth, deformed my lip (which I
> hadn't had medical attention for yet) slammed my face to the concrete,
> stomped on me, spit on me and laughed all while I was handcuffed
> and already sprayed with mase.  I had 1 eye sprayed with mase the 1st
> time they beat me, so I could see out of 1 eye, when I opened my eye,
> I seen the Lt. Carter punching me in the mouth knocking my teeth out
> shouting that he was the "baddest man in prison, can't an officer fill
> his shoes" and that if he ever <u>hear</u> anything "said" about what he just
> did, he would "come in my cell at 3:00 a.m. in the morning and do
> this again."

(Doc. 4 at 2) (italics added) (errors in original).  The plaintiff also claims Carter

beat him because he tried to tell Carter "what was happening" with his vigilante

officers. (*Id.*). The plaintiff claims he was "afraid for his life" because of Carter's threat. (*Id.*).

In the second amended complaint, the plaintiff lists only Carter and Burns as defendants. (Doc. 10 at 3). As to the Carter incident, the plaintiff accuses defendant Carter of ordering his officers to stop in the infirmary; when they stopped, Carter alone threw the handcuffed plaintiff to the ground "on [his] face" and sprayed him with mace. Carter then picked up the plaintiff and began punching him in the face as "hard as he could" knocking out his "platinum teeth." (*Id.* at 4). Carter then threatened to beat the plaintiff again if he revealed the assault. (*Id.*). The plaintiff identifies Sgt. Hamilton and Officers Burns, Burke, McQueen, Lukima, Humphrey, and Storey simply as *witnesses*, not defendants. (*Id.* at 4).[5]

On the other hand, defendant Carter attests that on the way to the infirmary, the plaintiff:

> began to shout at on looking inmates as they watched [him] being escorted. Inmate Townsend repeatedly tried to get on looking inmates to believe he had been beat up by officers. Inmate Townsend repeatedly stated, "Ya'll see this? The police beat me up for no reason! Ya'll need to do something about this! Ya'll need to kill them!" I ordered inmate Townsend to be quiet. Inmate Townsend shouted profanities at me stating "F—k you! This is my mouth! You can't tell me what to do or say!" . . . . Inmate Townsend is a very

---

[5] The plaintiff also identified Officer Mathis and Sgt. Mason as witnesses. As set out *supra*, defendant Mathis was named as a defendant, but the case against him has been dismissed for lack of prosecution. Sgt. Mason has never been a named defendant.

influential member of the Blood Gang.  To get inmate Townsend out of view of other inmates, Inmate Townsend was escorted into the Infirmary through the pill call area.  As inmate Townsend was escorted into the infirmary, [he] . . . . pulled away from the officers escorting.  Inmate Townsend was forcefully placed up against the wall to gain control by those officers.  Inmate Townsend alleges I picked him up and punched him in the face hard knocking his platinum teeth out.  This is not true.  At no time did I punch Inmate Townsend.  I, instead, ordered Inmate Townsend to calm down and be quiet.  Inmate Townsend was then escorted to the Nurses station for a body chart and decontamination.  Inmate Townsend was then escorted to Segregation where he remained pending disciplinary action for Assault of an ADOC official.  At no time did I threaten Inmate Townsend.

(Doc. 31-6 at 1-2) (redaction supplied).

The plaintiff does not deny that, while being taken to the infirmary, he shouted obscenities, refused to be quiet, complained that he had been beaten by officers, and instigated other inmates to harm officers.  Officer Lukima attests the plaintiff was shouting to other inmates that the police had assaulted him while being escorted to the infirmary.  (Doc. 31-7 at 1).  Lukima declares the plaintiff "was being loud and attempted to pull away from myself and Officer Lindsay" while they were in the pill call area.  (*Id.*).  The plaintiff does not deny that he jerked away from Lukima and Lindsay.

Lukima attests that he and Lindsay "placed inmate Townsend against the wall in order to gain control and calm" the plaintiff, causing the plaintiff's face to strike the wall.  (Doc. 31-7 at 1).  The officers again instructed the plaintiff to calm down, which he did.  (*Id.*).  Sgt. Hamilton also attests the plaintiff "jerked his arms

14

free from the escorting officers" as they entered the infirmary.  (Doc. 31-8 at 1).  Unlike the testimony of defendants Carter and Lukima, Hamilton declares an unidentified officer "placed inmate Townsend on the floor and regained control of" him.  (*Id.*).  Lukima attests that, once the plaintiff calmed down, he and Lindsay escorted the plaintiff "to the front of the infirmary for treatment."  (Doc. 37-1 at 1.).

Once in the infirmary, Nurse Marcano flushed the chemical spray from both of the plaintiff's eyes and removed the plaintiff's pants after noting chemical spray on them.  (Doc. 31-4 at 2).  The plaintiff told Marcano he thought his jaw was broken.  (Doc. 31-13 at 11).  Marcano cleaned blood "from the outside of" the plaintiff's face.  (*Id.*).  The plaintiff complained of swallowing blood.  (*Id.*).  Marcano noted the plaintiff: (1) "had a grill in his mouth made of some sort of metal;" (2) was spitting out parts of the metal, along with what may have been tooth fragments; but (3) would not open his mouth to allow Marcano "to make that determination."  (*Id.*).  In his second amended complaint, the plaintiff declares his "platinum bridge . . . was mutilated, 2 teeth were gone, my upper lip was busted open on the inside (I needed stitches) and I couldn't even get my mouth worked on cause I couldn't open my mouth because my jaw felt broken.  My lip healed deformed and I was traumatized."  (Doc. 10 at 4) (errors in original).

X-rays of the plaintiff's facial bones and mandible on the night of the incident revealed no fractures and the soft tissues were radiographically unremarkable.  (Doc. 36-13 at 7-10).  Color photographs of the plaintiff's face, head, back, torso, pelvis, legs, and feet also were taken in the infirmary.  (Doc. 31-4 at 4-11).  None of the photos show any cuts, abrasions, bruises, blood, or obvious swelling.  (*Id*.).  The plaintiff's mouth is closed in the frontal and side pictures of his head.  (*Id.* at 4, 7).  Other than bleeding to the right side of the plaintiff's lip, Marcano saw no other bleeding, bruising, swelling, or cuts.  (Doc. 31-4 at 2).  Marcano administered Ibuprofen and an ice pack, but the plaintiff refused treatment and stated he would "sign up for sick call later."  (Doc. 36-13 at 11).  The plaintiff complains Marcano only gave him Ibuprofen but does not deny he refused treatment.  (Doc. 10 at 4).

Thereafter, Burns charged the plaintiff with insubordination for saying, "F— k the police, this is my mother f—king mouth, F—k you!"  (Doc. 31-2 at 19).  He also charged the plaintiff with insubordination for refusing to return to his assigned living area when ordered to do so and Assault on a Person associated with ADOC for turning toward Burns with clinched fists.  (Doc. 31-2 at 21, 23).

On October 1, 2014, the plaintiff filled out two sick call request slips.  (Doc. 31-13 at 12, 14).  In the first, the plaintiff asked for a dentist "because the police beat me up and knocked my teeth out of my mouth and my mouth is swollen with

16

lacerations."   (*Id.* at 12).     The request also sought consultation with a nurse concerning his pain.  (*Id.*).  In the second, the plaintiff wrote,

> I have hemmoroids [sic] from when the police (correctional) officers beat me up and kicked me in my stomach.  Blood is coming out of my feces.  Also my lip has needed stitches ever[] since they beat me up. My lip is healing improperly and no one has even looked at it since the beating.  It is deformed and I need laser surgery.

(*Id.* at 14) (emphasis omitted).

On the same day, the plaintiff was seen in the infirmary for his dental issues. (*Id.* at 13).  His chief complaint concerned the loss of his "mouth pieces" and dental work due to the September 29, 2014 trauma.  (*Id.*).  He reported having "difficulty chewing" and pain to his "upper front" teeth, which he described as level seven (7) on a ten (10) point scale.  (*Id.*).  The nurse observed "[v]isual evidence of tooth decay/fracture" to the plaintiff's front teeth and an "upper right yellow lesion."  (*Id.*).

On October 7, 2014, the plaintiff refused to attend the disciplinary hearings resulting from the September 28-29, 2014 incidents.  (Doc. 31-2. at 19, 21, 23). He does not deny instructing Officer Weaver to tell "Sergeant Hamilton [the hearing officer] he can suck my d—k" regarding his refusal to attend the assault disciplinary hearing.  (*Id.* at 23).  The plaintiff's witness, inmate Manning, also refused to attend the hearings.  (*Id.* at 19, 21, 23).

Officer Burns testified at the hearings, and Hamilton found the plaintiff

17

guilty of the infractions. (*Id.* at 21-24). On October 11, 2014, Wardens Carter Davenport and Karen Carter approved the recommended punishments, which consisted of terms of disciplinary segregation and loss of various privileges, as well as custody review. (*Id.* at 20, 22, 24). The plaintiff was given copies of the disciplinary reports. (*Id.*).

On October 11, 2014, the plaintiff was seen in the infirmary for his "Lower GI Symptoms." (Doc. 31-13 at 15). He complained about his hemorrhoids and reported "having bright red blood when wiping" but no other lower gastrointestinal symptoms. (*Id.*). The plaintiff denied having any abdominal pain or back pain. (*Id.*). The plaintiff did report having an "altercation [with] DOC" as part of his past medical history. (*Id.*).

On October 22, 2014, the plaintiff filled out a sick call request and wrote that he had not been seen regarding his dental complaints, despite his October 1, 2014 request. (*Id.* at 18). On October 24, 2014, the plaintiff was seen by Dr. King. (*Id.* at 16). The plaintiff authorized Dr. King to conduct an examination and provide "general dental treatment." (*Id.*). Although extraction of tooth number nine[6] was recommended, the plaintiff refused treatment. (*Id.* at 17). None of the records reveal Dr. King's professional opinion about the condition of the plaintiff's front teeth, much less any causes of the condition.

---

[6] This is the left front tooth located in the maxillary (upper) arch of the mouth. *See* www.merckmanuals.com/professional/dental-disorders.

On October 27, 2014, the plaintiff presented to the infirmary complaining of a "sore to inside of cheek," dating from September 29, 2014, and described as a "canker sore." (Doc. 31-13 at 19). The plaintiff described intermittent pain at a level of four (4) on a ten (10) point scale. (*Id.*). Upon examination, Nurse Hawkins observed a "canker sore"[7] that had "almost healed." (*Id.*). There is a provider referral notation dated December 3, 2014, regarding the plaintiff's complaint about a history of lip injury, but it is not signed by a provider. (Doc. 31-13 at 6).[8]

## IV. Analysis

The plaintiff claims Fishback subjected him to excessive force, pursued a false disciplinary charge for assault against him, and retaliated against him for reporting Fishback's corrupt activities. (Doc. 4). The plaintiff claims the remaining defendants also subjected him to excessive force and retaliated against him on Fishback's behalf, defendant Carter retaliated against him after assaulting him, and defendant Burns pursued a false disciplinary charge for assault against him. (Doc. 10 at 4; Doc. 11 at 3).

---

[7] A canker sore is "a small painful ulcer especially of the mouth; *especially* **:** a painful shallow ulceration of the oral mucous membranes that has a grayish-white base surrounded by a reddish inflamed area and is characteristic of aphthous stomatitis." Available at http://merriam-webster.com/medlineplus/canker%20sore.

[8] There are three references in the medical records regarding the plaintiff's left hand, but since the first is dated August 4, 2014, and the plaintiff does not complain his hand was injured during his altercations with the defendants, this injury appears to be unrelated to the allegations underlying the complaint. (Doc. 31-13 at 6, 18).

## A.     Official Capacity Claims

To the extent the plaintiff requests monetary damages as relief for the constitutional claims against the defendants in their official capacities, the defendants' motions for summary judgment are due to be granted.  A law "suit against the State [of Alabama] and its [agencies for monetary damages is] barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit."  *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459 (1945); *Worcester Cty. Trust Co. v. Riley*, 302 U.S. 292 (1937)).

No such consent can be given under Art. I, Sec. 14, of the Alabama Constitution, which provides "the State of Alabama shall never be made a defendant in any court of law or equity."  *Id.*; *see also*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984).  Further, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is not different from a suit against the state itself."  *Will v. Michigan Dept. Of State Police*, 491 U.S. 58, 71 (1989) (citation omitted).

All of the defendants to this lawsuit are employees of the Alabama Department of Corrections, an agency of the State of Alabama.  Accordingly, to the extent the complaint asserts official capacity claims, Eleventh Amendment

20

immunity prohibits the plaintiff's suit for monetary damages. The motions for summary judgment filed by the defendants in their official capacities are due to be granted as a matter of law.

## B. Injunctive Relief

As part of his request for relief, the plaintiff asks for expungement of the assault disciplinary infractions, transfer to another institution, and "parole board" exoneration. (Doc. 10 at 5).

### 1. Expungement of Disciplinary Infractions

The request for expungement of disciplinary infractions seeks relief which is not cognizable via § 1983.

> [I]n order to recover damages [or declaratory relief] for a constitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Heck v. Humphrey*, 512 U.S. 477, 486 (1994) (footnote omitted).

The *Heck* rationale is applied in prison disciplinary proceedings, and the terms "conviction" and "sentence" in the disciplinary context are construed to denote only those punishments affecting the duration of an inmate's imprisonment or "a judgment" that would "necessarily imply the invalidity" of the disciplinary infraction. *Edwards v. Balisok*, 520 U.S. 641, 645 (1997). If either of these

circumstances occurs, the disciplinary infraction must be invalidated before the inmate can pursue a claim for damages or declaratory relief pursuant to 42 U.S.C. § 1983. *Id.* at 646, 649. The plaintiff maintains he is innocent of the false "assault charges" and demands expungement. (Doc. 4 at 2; Doc. 10 at 5) (emphasis omitted). Thus, a judgment in his favor would necessarily imply the invalidity of his underlying disciplinary infractions. There is no evidence the infractions have been nullified by any agency or court. Accordingly, the plaintiff's request for expungement of the assault infractions is due to be denied.

### 2.   Transfer

The plaintiff now is housed at Holman Correctional Facility and is no longer an inmate at St. Clair Correctional Facility. (Doc. 19 at 2). Accordingly, his request for transfer to another institution is moot.

### 3.   Parole Exoneration

The undersigned construes the plaintiff's request for parole exoneration as a demand for release on parole. Challenges to the fact or duration of an inmate's confinement may only be accomplished by way of a petition for writ of *habeas corpus. See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) ("[W]hen a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of

habeas corpus.").   Accordingly, to the extent the plaintiff's amended complaints can be read to request a release from custody, such relief is not appropriate in an action under § 1983, and any claims in that regard are due to be dismissed.

## C.    Eighth Amendment Excessive Force

The Eighth Amendment prohibition against cruel and unusual punishment is triggered when a prisoner is subjected to an "unnecessary and wanton infliction of pain."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> [W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry [in determining whether a prisoner has suffered unnecessary and wanton pain] is that set out in *Whitley*, whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

*Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  In extending *Whitley* to all cases involving allegations of the use of force by prison officials, the Supreme Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order.   Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates.   Both situations may require prison officials to act quickly and decisively.   Likewise, both implicate the principle that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"

*Hudson*, 503 U.S. at 6 (quoting *Whitley*, 475 U.S. at 321-22).

23

"The use of force must stop when the need for it to maintain or restore discipline no longer exists." *Skrtich v. Thornton*, 280 F.3d 1295, 1304 (11th Cir. 2002) (citing *Whitley*, 475 at 320-21).  Therefore, if a non-compliant inmate has been restrained by guards and no longer poses a threat, he "cannot be subjected to gratuitous or disproportionate force that has no object but to inflict pain." (*Id.*).

With these concerns in mind, the Supreme Court set out certain factors that should be considered when evaluating whether the force used was excessive. These factors include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate. *Id.* at 7; *see Hewett v. Jarrad*, 786 F.2d 1080, 1085 (11th Cir. 1986).

In applying the foregoing factors to the facts of a particular case, the Supreme Court has instructed:

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. *See Johnson v. Glick*, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").  The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not a sort "'repugnant to the conscience of mankind.'"

*Hudson*, 503 U.S. at 9 (internal citations omitted). Finally, it is well established that a prison official need not:

24

actually participate in the use of excessive force in order to be held liable under section 1983.  Rather, an [official] who is present at the scene and who fails to take reasonable steps to protect the victim of another [official's] use of excessive force, can be held liable for his nonfeasance.

*Skrtich v. Thornton*, 280 F.3d at 1302 (quoting *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985)).  "But it must also be true that the non-intervening officer was in a position to intervene yet failed to do so."  *Hadley v. Gutierrez*, 526 F.3d 1324, 1330-1331 (11th Cir. 2008) (citing *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000)).

## 1.    Qualified Immunity

The defendants assert the affirmative defense of qualified immunity in connection with plaintiff's claims of excessive force.  However:

In this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force "maliciously and sadistically to cause harm" is clearly established to be a violation of the Constitution by the Supreme Court decisions in *Hudson* and *Whitley*.  *See Johnson. v. Breeden*, 280 F.3d 1308, 1319 (11th Cir. 2002).  There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation.  *Id.*  The only question, then, is whether the plaintiff has alleged facts sufficient to survive a motion to dismiss or motion for summary judgment.  If he has done so, that is the end of the inquiry.

*Skrtich v Thornton*, 280 F.3d at 1301.  Accordingly, because qualified immunity is not at issue, the remainder of the section is dedicated to determining whether the plaintiff has alleged sufficient facts to survive the defendants' motions for summary judgment.

25

### 2.    The Fishback Incident

Applying the first and third factors in evaluating the excessive force claim against Fishback, it is undisputed that the plaintiff twice refused to leave the G-Dorm gate when defendant Fishback ordered him to do so.  (Doc. 31-2 at 6). Fishback then opened the gate and instructed the plaintiff to step inside the gate. (*Id.*).  The plaintiff did so, and Fishback pepper sprayed him.  (*Id.*).

"Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding."  *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) (quoting *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)).  "And prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out."  *Id.* (quoting *Bennett,* 898 F.2d at 1533).  "Pepper spray is an accepted non-lethal means of controlling unruly inmates."  *Id.*  The plaintiff's repeated refusal to obey Fishback's orders and attempts to get the attention of other inmates establish Fishback's need to use force.  (*See* Doc. 31-2 at 6-7).  The plaintiff's contention that no force should have been used because he obeyed Fishback's order to enter the gate is unavailing as it cannot be said "that it was unreasonable for" Fishback "to believe that some force was necessary under the facts presented here."  *Fennell v. Gilstrap*, 559 F.3d 1212, 1218 (11th Cir. 2009).

As for the second factor, "[a] short burst of pepper spray is not

disproportionate to the need to control an inmate who has failed to obey a jailer's orders." *Danley v. Allen*, 540 F.3d at 1307. After being pepper sprayed, the plaintiff was immediately escorted to the infirmary and decontaminated. (Doc. 46-1 at 1; Doc. 31-13 at 2-5). He does not complain of any other injury. "Pepper spray 'is designed to disable a suspect without causing permanent physical injury. Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle[.]'" *Danley*, 540 F.3d. at 1308 (quoting *Vinyard v. Wilson,* 311 F.3d 1340, 1348 (11th Cir. 2002) (omitting internal quotation marks and citations)). "Any injuries or discomfort" the plaintiff "suffered as a necessary result of a dose of pepper spray were neither substantial nor long lasting." *Id.* As such, the fourth and fifth factors weigh heavily in favor of Fishback.

For the foregoing reasons, the plaintiff has failed to set forth evidence creating a genuine dispute regarding whether defendant Fishback used an unreasonable and excessive amount of force against him on July 9, 2014. Accordingly, Fishback is entitled to judgment as a matter of law, and his motion for summary judgment is due to be granted as to this claim.

### 3.   The Burns Incident

#### a.   Burns

Construing the facts in a light most favorable to the plaintiff, it is undisputed that following the September 28, 2014 disciplinary hearing, the plaintiff refused

27

direct orders to stop cursing and threatening Burns and to return to his assigned cell. (Doc. 10 at 4; Doc. 35-1 at 1). The plaintiff then turned toward Burns with his fists clenched but started to run when Burns reached for his mace. (*Id.*). Nonetheless, when Burns gave the plaintiff a direct order to get on the ground, the plaintiff "immediately dropped to the ground on" his stomach with his hands on his head, and Burns jumped on his back and handcuffed him. (Doc. 10 at 4).

Once the plaintiff was subdued, he was no longer a threat to defendant Burns, and there was no need for any additional force. Yet, Burns "punched" the plaintiff in the face "from both sides with both hands" and then pepper sprayed both sides of the plaintiff's face. (*Id.*).

Under the facts as alleged by the plaintiff, Burns's actions constitute "gratuitous or disproportionate force that has no object but to inflict pain." *Skrtich v. Thornton*, 280 F.3d at 1304. Thus, in evaluating factors one through four in the context of the excessive force claim against Burns, those factors weight in favor of the plaintiff. The plaintiff was subjected to pain and suffering because of the chemical spray, and it can be inferred from the facts that Burns's use of the spray was motivated by frustration or anger at the plaintiff's recent behavior. The same logic applies to Burns' act of punching the plaintiff in the face. Although clearly a close question, a jury could determine that there is at least some of evidence that the jaw pain complained of by the plaintiff was attributable to the actions of

28

defendant Burns.  In short, even if the plaintiff's injuries are considered *de minimis*, a jury could still find for the plaintiff because Burns's use of force is "'repugnant to the conscience of mankind.'"  *Hudson*, 503 U.S. at 9 (internal citations omitted).

Accepting the plaintiff's version of facts as true, he has established a genuine dispute regarding each material fact supporting his excessive force claim against defendant Burns.  As such, defendant Burns's motion for summary judgment is due to be denied.

### b.    The "whole shift"

After Burns punched and maced him in the face, the plaintiff attests he "lay there while the other officers" arrived and continued to beat him.  (Doc. 10 at 4). He also attests he could not see anything when lifted to his feet.  (*Id.*).  The plaintiff has never made the identity of 'the other officers' perfectly clear.  The clarification is critical considering the plaintiff's apparent inability to identify the officers due to impaired vision and pronate body position.  The offending officers' identities and individual participation in the beating could have been resolved if the plaintiff had submitted testimony from the inmates he declares were eyewitnesses to this event, but he failed to do so.

Instead, the plaintiff chooses to support this aspect of his claim by naming numerous officers in the title of his first amended complaint and making a conclusory assertion in the body of the complaint that the "whole shift" beat him.

29

The only possible clarification appears in the plaintiff's third amended complaint in which he names Burns as the primary defendant, and Carter, Storey, and Humphrey as additional defendants. (Doc. 11 at 3). The body of that complaint is devoted solely to the Burns Incident and the assertion that "other officers" arrived and beat him while he was still on the ground. (*Id*.). Such allegations leave the undersigned in the position of inferring that Carter, Storey, and Humphrey were the only "other officers" who beat the plaintiff, to the exclusion of all previous possible perpetrators.

In addition to the plaintiff's failure to clarify the identity of the defendants and their individual participation in "beating" him immediately after the Burns incident, the plaintiff does not proffer evidence to rebut the testimony of defendants Burke, Storey, McQueen, Fishback, Humphrey. These defendants attest they either were not at work, were assigned to the segregation unit on the day of the incident, have no personal knowledge of the incident, or arrived on the scene as the plaintiff was being escorted to the infirmary. (Docs. 31-8, 31-9, 31-10, 31-11, 46-1).

Rule 8 of the *Federal Rules of Civil Procedure* requires "a § 1983 plaintiff to allege with some specificity the facts which make out [his] claim." *Wilson v. Strong,* 156 F.3d 1131, 1135 (11th Cir. 1998) (quoting *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)). Defendants

Burke, Storey, McQueen, Fishback, and Humphrey have responded to the plaintiff's vague and ambiguous accusations with testimony affirmatively denying that they were the "other officers" who beat him. The plaintiff rebuts their testimony with the same sort of general and vague accusations included in the amended complaints. Such accusations constitute, at best, a mere scintilla of evidence to support the plaintiff's position and are insufficient to defeat a properly supported motion for summary judgment. *Walker v. Darby*, 911 F.2d 1573 (11th Cir. 1990) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)).

The plaintiff has failed to meet his burden to produce enough evidence "that a jury could reasonably find for him" with regard to excessive force claims against defendants Burke, Storey, McQueen, Fishback, and Humphrey. Accordingly, the motions for summary judgment filed by Burke, Storey, McQueen, Fishback, and Humphrey are due to be granted.

Even if the plaintiff's declaration that "the whole shift" beat him were sufficiently specific, as explained below, the motions for summary judgment filed by Burke, Storey, McQueen, Fishback, and Humphrey are nonetheless due to be granted as to excessive force. Since these defendants deny being present at the beating for various reasons, there is a genuine dispute regarding these defendants' participation in beating the plaintiff as he lay handcuffed on the ground.

The remaining defendants—Lukima, Carter, and Hamilton—admit they were in the vicinity soon after the Burns incident.  Defendant Lukima testifies that he responded to Burns's call for assistance, was aware of an altercation between Burns and the plaintiff, and "assisted in handcuffing" the plaintiff.  (Doc. 31-7 at 1).  Carter testified he saw the plaintiff on the grounds and "heard him shouting profanities" to Burns and other unidentified officers.  (Doc. 31-6 at 1).  Carter was present when the plaintiff "was placed in handcuffs and assisted to his feet."  (*Id*.).  Hamilton attests he arrived on the scene as the handcuffed plaintiff was being escorted to the infirmary.  (Doc. 31-8 at 1).  As such, there is a genuine dispute regarding the participation of these defendants in the plaintiff's beating.

As for the beating itself, according to the plaintiff's testimony, he was handcuffed and lying face down on the ground with defendant Burns on his back when the other eight defendants attacked.  The plaintiff does not describe what he means by being beaten in the amended complaints, and the only injuries observed or complained of at the prison infirmary that evening are attributable to allegations pertaining to Burns alone and a later incident with defendant Carter.  There is an October 1, 2014 sick call form in which the plaintiff complained he had hemorrhoids and bloody stool as a result of the beating, during which he was kicked in the stomach.  (Doc. 31-13 at 12, 14).  Medical staff examined the plaintiff about his hemorrhoids on October 11, 2014, but he reported having no

32

lower gastrointestinal symptoms, abdominal pain, or back pain. (*Id.* at 15). Further, the undisputed medical record shows the plaintiff had a hemorrhoid history long before the event in question. (Doc. 31-13 at 2-5).

When the foregoing facts are taken in a light most favorable to the plaintiff, all but the fourth and fifth factor pertinent to the excessive force standard weigh in favor of the plaintiff and against Burke, Storey, McQueen, Fishback, Humphrey, Lukima, Carter and Hamilton. There was no justification for kicking the plaintiff while he was handcuffed and lying face down while Burns pinned him to the ground. In addition to his prostrate position, the plaintiff also had been maced. He could not have reasonably been perceived as a threat. Thus, excessive force factors one, two, and three weigh in the plaintiff's favor.

However, factors four and five overwhelmingly weigh in the defendants' favor. The records show the plaintiff had hemorrhoids prior to September 28, 2014. As for the incident itself, the plaintiff does not reveal how many times he was kicked or explain the forcefulness of the kicks. He also does not explain how he was kicked in the stomach while lying face down with defendant Burns on his back. The medical records undisputedly show the plaintiff's only injuries on the night in question were to his mouth—he had no marks, cuts, abrasions or bruising to his body and never made any complaints that his abdomen hurt. Thus, the severity of any kicks to the plaintiff's stomach were *de minimis*. This complete

33

absence of injury would be impossible if eight corrections officers had repeatedly kicked the plaintiff at the same time.  It cannot reasonably be inferred that the plaintiff's complaint of hemorrhoid symptoms bore any relationship to being kicked in the stomach.

For all of the foregoing reasons, the plaintiff has failed to establish a genuine dispute of material fact in connection with his excessive force claims against "the whole shift," *i.e.*, Burns, Burke, Storey, McQueen, Fishback, Humphrey, Lukima, Carter, and Hamilton.  Accordingly, these defendants are entitled to judgment as a matter of law and summary judgment is due to be granted in their favor on this claim.

### 4.    The Carter Incident

Other than determining the identity of the defendants and the nature of their participation in the incident in the pill call area, most of the facts underlying the plaintiff's excessive force claim arising from the Carter Incident are undisputed. As for determining the defendants and the claims against them, the plaintiff's first amended complaint included allegations to the effect that defendants Burns, Burke, Storey, McQueen, Humphrey, Lukima, and Hamilton followed Lt. Carter's order to stop in the pill call area.  (Doc. 4 at 2).  "They" then slammed the plaintiff's "face to the concrete," and laughed as they stomped and spit on him.  (*Id*.).  The plaintiff could see "Lt. Carter punching me in the mouth knocking my teeth out."  (*Id*.).

34

Carter threatened the plaintiff as well.  (*Id*.).

The second amended complaint also alleges Carter ordered his officers to stop in the infirmary, which they did.   (Doc. 10 at 4).  After stopping, Carter alone threw the handcuffed plaintiff to the ground face-first and sprayed him with mace. (*Id.*).  Carter then picked up the plaintiff and began punching his face as "hard as he could," knocking out the plaintiff's "platinum teeth" in the process. (*Id.*).  Carter threatened to beat the plaintiff again if he complained about the assault.  (*Id.*). Here, the plaintiff expressly identifies Sgt. Hamilton and officers Burns, Burke, McQueen, Lukima, Humphrey, and Storey simply as *witnesses*, not defendants. (*Id.*).[9]

Again, Rule 8 requires "a § 1983 plaintiff to allege with some specificity the facts which make out [his] claim."   *Wilson v. Strong,* 156 F.3d 1131, 1135 (11th Cir. 1998) (quoting *GJR Investments, Inc. v. Cty. of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)).  While a court must interpret a *pro se* plaintiff's pleadings liberally, the court cannot effectively litigate for the plaintiff.  Based on the second amended complaint, the sole claim being raised by plaintiff is his Eighth Amendment excessive force claim against defendant Carter.

Burke, Storey, McQueen and Humphrey deny being present during the Carter Incident.  (Docs. 31-9, 21-10, 31-11, 32-1).  Lukima, Carter, and Hamilton

---

[9] The plaintiff also identified Officer Mathis and Sgt. Mason as witnesses.  As set out above, the claims against Mathis have been dismissed.  Sgt. Mason never has been a named defendant.

admit they escorted the plaintiff to the infirmary, and Burns does not dispute he was present during this time period. (Doc. 31-5 at 1). Carter attests the plaintiff, an influential member of the Blood Gang, was shouting obscenities about being beaten by police in an effort to incite other inmates and was pulled into the pill call area to remove him from other inmates. (Doc. 31-6 at 1-2). Lukima also attests the plaintiff, while being escorted to the infirmary, was shouting to other inmates that the police had assaulted him. (Doc. 31-7 at 1). The plaintiff does not dispute these averments. Lukima attests that upon arrival in the pill call area, the plaintiff "was being loud and attempted to pull away from [him] and Officer Lindsay." (*Id.*). Hamilton also attests the plaintiff jerked his arms away from the officers. (Doc. 31-8 at 1). The plaintiff has not disputed this testimony.

Lukima attests that he and Officer Lindsay "placed inmate Townsend against the wall in order to gain control and calm" him and his "face struck the wall" as a result. (Doc. 31-7 at 1). The plaintiff was instructed to calm down, which he did. (*Id.*). However, defendant Hamilton declares an unidentified officer placed the plaintiff "on the floor and regained control" of him. (Doc. 31-8 at 1). Defendant Carter denies attacking or threatening the plaintiff and declares that he instead ordered the plaintiff to be quiet. (Doc. 31-6 at 1-2).

Construing the facts in a light most favorable to the plaintiff, the Carter Incident was preceded by the plaintiff's cursing and loud complaining to other

36

inmates about being beaten by corrections officers while being escorted to the infirmary. At the time, the plaintiff was handcuffed and had chemical spray in his eyes. Once the plaintiff was removed to the pill call area, he jerked his arms away from Officers Lukima and Lindsay.

In response, Carter ordered the escorting officers to stop. At this juncture, it is undisputed that Carter, Lukima, Lindsay, and Hamilton were present, and the plaintiff attests Burke, Storey, McQueen, and Humphrey were present as well. Thus, between four and nine corrections officers were in the pill call area. After ordering the escorting officers to stop, defendant Carter threw the handcuffed plaintiff to the ground face-first and maced him. Carter then picked up the plaintiff and began hitting him in the face, knocking out the plaintiff's platinum teeth while screaming in anger and issuing threats. (Doc. 4 at 2; Doc. 10 at 4).

Considering the plaintiff's loud complaints and attempt to pull away from Lukima and Lindsay, there was a need for application of force in order to maintain order and security. Under the circumstances, Carter did not unreasonably or intemperately respond to the plaintiff's behavior by knocking the plaintiff to the ground and macing him, and the plaintiff does not allege he suffered any injury from the fall or any additional injury from being maced a second time. Once on the ground, the plaintiff was effectively neutralized. However, Carter did not stop there. Instead, he continued to beat the neutralized plaintiff out of anger. These

37

facts are sufficient to establish Carter's actions at that juncture were nothing but "gratuitous or disproportionate force that has no object but to inflict pain." *Skrtich v. Thornton*, 280 F.3d at 1304. Thus, in evaluating factors one through four in the context of the plaintiff's excessive force claim against Carter, those factors weigh in favor of the plaintiff.

Carter hit the plaintiff with enough force to dislodge and break his bridge and cut the inside of his mouth. The force was also significant enough that the plaintiff could not open his mouth because he thought his jaw was broken. Although this fear was determined to be medically unfounded, for several days after the incident the plaintiff's jaw was sore and his front teeth hurt. Carter's act of punching the plaintiff in the face was a clearly motivated by anger and vengefulness. As such, even if the plaintiff's injuries were assumed to be *de minimis*, a jury could still find for the plaintiff because Carter's use of force is "'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9 (internal citations omitted).

Viewing the facts in the light most favorable to the plaintiff, he has established a genuine dispute regarding each material fact supporting his excessive force claim against Carter. Accordingly, Carter's motion for summary judgment is due to be denied as to this claim.

## D. False Disciplinary Infractions

The plaintiff claims defendant Fishback falsely charged him with an assault infraction to cover up his July 9, 2014 use of excessive force, and defendant Burns instituted the same charge to cover up for his September 28, 2014 use of excessive force. (Doc. 4 at 1; Doc. 46-1 at 1). However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct[.]" *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied,* 485 U.S. 982 (1988). As long as an inmate is afforded the minimum procedural due process protections set forth in *Wolff v. McDonnell,* 418 U.S. 539 (1974), his action for damages resulting from the alleged false charge must fail. The procedures in *Wolff* allow a prisoner to defend against improper or false disciplinary charges by affording the inmate the opportunity to explain his version of the facts to the disciplinary officer. *Hanrahan v. Lane*, 747 F.2d 1137, 1139-1140 (7th Cir. 1984).

> *Wolff* instructed that prisoners must receive: (1) advance written notice of the charges against them; (2) an opportunity for the inmate to call witnesses and present documentary evidence, so long as doing so is consistent with institutional safety and correctional goals; and (3) a written statement by the factfinder outlining the evidence relied on and the reasons for the disciplinary action.

*O'Bryant v. Finch*, 637 F.3d 1207, 1213 (11th Cir. 2011) (citing *Wolff*, 418 U.S. at 563-67).

The undisputed record shows the plaintiff was notified of Fishback's assault charge against him, was given a disciplinary hearing where he was allowed to testify and present questions, and received a copy of the report setting out the hearing officer's evidentiary findings and reason for the disciplinary action. (Doc. 31-2 at 2-17). There was clearly some evidence to support the finding of guilt. See *Superintendent v. Hill*, 472 U.S. 445, 454 (1985) (holding procedural due process is satisfied if there is "some evidence" in the record to support the finding of guilt). As such, the plaintiff received the due process to which he was entitled.

The plaintiff also was not deprived of due process in connection with the disciplinary infraction for assault instituted by Burns. The plaintiff was given notice of the charges against him and was afforded an opportunity to call witnesses and present evidence at an evidentiary hearing. (Doc. 32-2 at 19, 21, 23). However, the plaintiff refused to attend the hearing. (*Id*. at 23). The plaintiff was given the protections afforded by *Wolff* but declined to participate.

For the foregoing reasons, the plaintiff has failed to show genuine disputes of material fact in connection with his claims that Fishback and Burns deprived him of due process of law by pursuing false disciplinary charges against him. Fishback and Burns are entitled to judgment as a matter of law on this claim.

## E.    Retaliation

> An inmate must establish three elements to prevail on a retaliation claim. *Bennett* [*v. Hendrix*], 423 F.3d [1247] at 1250

40

> [(11th Cir. 2005)].  The inmate must prove that: (1) "his speech or act was constitutionally protected"; (2) "the defendant's retaliatory conduct adversely affected the protected speech"; and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech."  *Id.*  To establish causation, the plaintiff must show that the defendant was "subjectively motivated to discipline" the plaintiff for exercising his First Amendment rights.  *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008).

*Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).

### 1.    Fishback and Burns

The plaintiff attests he reported to "the Administration" that Fishback had filed a false disciplinary charge for assault against him and that Fishback was dealing drugs in the prison.  (Doc. 4 at 1).  "It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement."  *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).  The plaintiff's report of Fishback's activities meets the first element of his retaliation claim because it constitutes protected speech.

As for the second element, it is well established that the "First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment."  *Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006) (citing *Wildberger v. Bracknell,* 869 F.2d 1467, 1468 (11th Cir. 1989) (per curiam)).  The second element has also been defined as "retaliatory conduct"

41

by the defendant that "adversely affect[s] the protected speech." *Bennett v. Hendrix*, 423F.3d 1247, 1250 (11th Cir. 2005).

After he was released from segregation, the plaintiff attests Fishback harassed him by giving his mail to other inmates. (Doc. 4 at 1). Fishback also threatened take revenge on the plaintiff for complaining to administration; he followed through with the threat by goading defendant Burns, his partner and a vigilante officer, into beating the plaintiff. (*Id.*). Fishback denies harassing the plaintiff and bringing drugs into the prison and declares he has "no knowledge" of causing conflicts between the plaintiff and any officers. (Doc. 46-1 at 1).

The plaintiff has produced no evidence to show how he is aware Fishback not only misdirected his mail but did so intentionally and because the plaintiff had filed a complaint against him. The plaintiff does not reveal when or how many times his mail was misdirected and to whom his mail was given. The plaintiff also has produced no evidence to support his conclusory assertion that Fishback "teased" Burns into beating him, nor does the evidence surrounding the Burns Incident reveal any connection to Fishback. As such, the plaintiff has failed to meet his burden of creating a genuine dispute as to the causal connection between his complaint against Fishback and either the misdirection of his mail or between Fishback and Burns in connection with the altercation with defendant Burns. The plaintiff has also has failed to rebut the absence of these material facts with

42

evidence. *See Farrow v. West*, 320 F.3d 1235, 1248-49 (11th Cir. 2003) (quoting *Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991) ("If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence.")).

The undersigned recognizes that "threats" to retaliate against an individual for exercising protected speech can suffice to state a First Amendment claim but only if there is "threat of specific future harm" that would deter a person of "ordinary firmness" from exercising that right. *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005) (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972), and *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)). Defendant Fishback made no specific threat of future harm when he told the plaintiff he would get the plaintiff back for reporting his unprofessional behavior. Fishback's statement would not deter a person of ordinary firmness from exercising his right to free speech. Accordingly, Fishback and Burns are entitled to judgment as a matter of law on this claim.

### 2.   Carter

Conversely, when Lt. Carter punched the plaintiff in the mouth, he shouted that he was the "baddest man in prison, can't an officer fill his shoes" and told the

43

plaintiff "that if he ever heard anything 'said' about what he just did, he would 'come in my cell at 3:00 a.m. in the morning and do this again.'" (Doc. 4 at 2) (emphasis omitted). Carter clearly made a specific threat that he would physically harm the plaintiff at a particular time and place if the plaintiff ever complained about Carter hitting him. A prisoner's grievance about officer abuse is speech protected by the First Amendment. Carter's specific threat of physical harm is the type of threat that would ordinarily deter a person from exercising his First Amendment rights. Thus, the plaintiff has produced facts sufficient to create a genuine dispute regarding his First Amendment retaliation claim against defendant Carter.

Carter asserts the defense of qualified immunity. (Doc. 31 at 14). A valid qualified immunity defense requires a burden shifting analysis. The defendant must first prove that he was acting within his "discretionary authority." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). If the defendant makes that showing, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate by demonstrating the deprivation of a constitutional or federal statutory right which was clearly established when the defendant acted. *See Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009).

While the determination of whether a federal constitutional or statutory right was violated depends on the right asserted, a common standard is used to determine whether a right was "clearly established."

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell [v. Forsyth*, 472 U.S. 511, 535 n.12, (1985)]; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

A right is clearly established for purposes of the doctrine of qualified immunity if an earlier court decision "gave reasonable warning that the conduct then at issue violated constitutional rights."  *Id.*  The only decisions that can give such warning are those "of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."  *Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir. 1997).

Carter admits he was acting in his discretionary authority as a corrections officer on September 28, 2015.  (Doc. 31 at 16).  In 2005, the Eleventh Circuit held that  threats to retaliate against an individual for exercising protected speech can sustain a First Amendment claim if there is "threat of specific future harm" that would deter a person of "ordinary firmness" from exercising that right.  *Bennett v.*

*Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005). Defendant Carter is not entitled to qualified immunity in connection with his threats to the plaintiff because any reasonable officer would have understood Carter's September 28, 2015 actions to be unlawful. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). Accordingly, Carter's motion for summary judgment is due to be denied as to this claim.

### 3.     Remaining defendants

To the extent the plaintiff intended to assert retaliation claims against any other defendant in connection with his having reported Fishback's misconduct, summary judgment is due to be granted. The plaintiff has failed to provide any specific facts or evidence to support such a claim and has not created the genuine dispute necessary to survive the remaining defendants' motion for summary judgment. Accordingly, aside from Carter, the defendants are entitled to judgement as a matter of law as to any First Amendment claims, and summary judgment is due to be granted in their favor.

## F.     Lt. Carter- Supervisory Liability

The plaintiff contends Lt. Carter can be held vicariously liable because he supervises a shift of "vigilante" officers who beat inmates without provocation and cover up these assaults by initiating false disciplinary charges. (Doc. 4 at 1). Carter denies this accusation. (Doc. 31-1 at 1).

To the extent the plaintiff seeks to hold defendant Carter liable on the basis of his supervisory role, he has failed to state a claim.  It is well settled that there "is no respondeat superior liability under § 1983."  *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995) (citing *Monell v. Department of Social Services*, 436 U.S. 658, 690-92 (1978) and *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993)); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis respondeat superior or vicarious liability").

In fact, the "standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous." *Id*. at 1360-61; *quoting Gonzalez v. Reno*, 325 F.3d 1228, 1324 (11th Cir  2003).  A supervisor may be held accountable only if he "personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation."  *Id*. at 1360. This causal connection can be established: (1) when a history of widespread abuse places the supervisor on notice of the need to correct the violation; (2) when a supervisor's custom or policy is the cause of the violation; or (3) when a supervisor has knowledge that subordinates will act unlawfully and fails to prevent them from doing so. *Id*. at 1360.

47

The plaintiff has not supported his conclusory allegations against Lt. Carter with any supporting facts, and he cannot rely solely on the facts supporting his own claims to create a genuine dispute regarding whether Sgt. Carter is liable in his supervisory capacity for the unconstitutional actions of the officers he supervises. Accordingly, summary judgment is due to be granted in favor of Lt. Carter.

## V. Recommendation

For the reasons stated above, the undersigned **RECOMMENDS** the motions for summary judgment be: (1) **GRANTED IN PART** as to all claims against Fishback, Burke, McQueen, Hamilton, Lukima, Storey, and Humphrey and that these claims be **DISMISSED WITH PREJUDICE**; and (2) **DENIED IN PART** as to the Eighth Amendment excessive force claims against defendants Burns and Carter, and the First Amendment retaliation claim against defendant Carter. The undersigned **FURTHER RECOMMENDS** the surviving claims be **REFERRED** to the undersigned for further proceedings.

## VI. Notice of Right to Object

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered. Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objection.

Failure to object to factual findings will bar later review of those findings, except for plain error. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013). Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address. Objections should not contain new allegations, present additional evidence, or repeat legal arguments. An objecting party must serve a copy of its objections on each other party to this action.

On receipt of objections, a United States District Judge will make a *de novo* determination of those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the findings of fact and recommendations made by the magistrate judge. The district judge must conduct a hearing if required by law. Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence. Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record. The district judge also may refer this action back to the magistrate judge with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may only appeal from a final judgment entered by a district judge.

**DONE** this 13th day of February, 2017.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE